127 P.3d 84

STATE of Hawai'i, Plaintiff–Appellee,

v.

Dennis MACHADO, Defendant–Appellant.

No. 26396.

Intermediate Court of Appeals of Hawai'i.

Oct. 3, 2005.

Certiorari Granted Nov. 9, 2005.

Josette Anne Wallace (Warner & Wallace), on the briefs, for Defendant–Appellant.

Peter A. Hanano, Deputy Prosecuting Attorney, County of Maui, for Plaintiff–Appellee.

LIM, Acting C.J., FOLEY and FUJISE, JJ.

Opinion of the Court by LIM, Acting C.J.

Dennis K. Machado (Defendant) appeals the January 12, 2004 judgment of the Circuit Court of the Second Circuit (circuit court),[1] as amended on February 12, 2004. The judgment convicted him, upon a jury's verdicts, of the charged offense of abuse of a family or household member [2] and the includ-

---

1. The Honorable Joel E. August presided.

2. Hawaii Revised Statutes (HRS) § 709–906(1) (Supp.2004) provides, in pertinent part: "It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member[.]" *See also* HRS § 702–204 (1993) ("When

the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly."); *State v. Eastman*, 81 Hawai'i 131, 140, 913 P.2d 57, 66 (1996) (pursuant to HRS

ed offense of terroristic threatening in the second degree.[3]

Defendant contends the circuit court (1) incorrectly allowed extensive hearsay under the excited utterance exception, (2) abused its discretion in allowing highly prejudicial testimony of an expert on domestic violence, and (3) deprived him of his constitutional right to confrontation by limiting cross-examination of the complaining witness (CW) in an area directly relevant to the CW's credibility. We disagree, and affirm.

## I. Background.

On September 27, 2001, a domestic altercation took place at the Wailuku residence Defendant shared with his girlfriend, the CW. The first trial of the matter, held in June 2002, ended in a hung jury and a mistrial. The trial underlying this appeal started on October 20, 2003.

Virginia Redondo Sandell (Sandell), the neighbor across the street, testified that on September 27, 2001, at about 10:20 p.m., she heard a ruckus at Defendant's house. "There were screaming, yelling noise, sound like things were breaking.... I heard a woman screaming.... It just sounded like someone was in a serious situation. It sounded very, very loud, like she was hurt, needed help, she was calling out for help." Sandell called 911. The police arrived within three to five minutes.

Maui Police Department (MPD) sergeant Roy Hirayama (Sergeant Hirayama) testified next. At about 10:22 p.m. that evening, he was dispatched to a reported abuse at Defendant's house. When Sergeant Hirayama got there, he saw Defendant standing in the driveway. Sergeant Hirayama also noticed clothes strewn about in front of the residence. Defendant told Sergeant Hirayama, "Nothing physically transpired and I want to leave the residence." Defendant smelled of alcohol. At about 10:30 p.m., Sergeant Hirayama heard the CW crying inside the house, so he entered and inquired after her. Sergeant Hirayama recalled, "There was a slight odor of liquor on her breath." He acknowledged that "she was pretty hysterical or pretty emotional[.]"

When the deputy prosecuting attorney (DPA) started to question Sergeant Hirayama about what the CW then told him, defense counsel objected to the hearsay, but the circuit court admitted it after the DPA cited the excited utterance exception to the hearsay rule.[4] Thus, Sergeant Hirayama's

§ 702–204, "the requisite state of mind for a violation of HRS § 709–906(1) is that of acting intentionally, knowingly, or recklessly"); *State v. Tomas*, 84 Hawaiʻi 253, 257, 933 P.2d 90, 94 (App.1997) ("to 'physically abuse' someone under HRS § 709–906(1) means to maltreat in such a manner as to cause injury, hurt or damage to that person's body" (citations and some internal quotation marks omitted)), *overruled on other grounds by State v. Gonsales*, 91 Hawaiʻi 446, 984 P.2d 1272 (App.1999); *State v. Nomura*, 79 Hawaiʻi 413, 415–16, 903 P.2d 718, 720–21 (App. 1995) (in a prosecution for abuse of a family or household member, jury instructions defining "physical abuse" as "causing bodily injury to another person[,]" and "bodily injury" as "physical pain, illness or any impairment of physical conditions [sic,]" were not incorrect (block quote format omitted)). Abuse of a family or household member is a misdemeanor. HRS § 709–906(5) (Supp.2004).

**3.** HRS § 707–715 (1993) reads, in relevant part: "A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony: With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]" (Enumeration omitted; format modified.) HRS § 707–716(1)(d) (1993) provides: "A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:.... With the use of a dangerous instrument." (Enumeration omitted; format modified.) Terroristic threatening in the first degree is a class C felony. HRS § 707–716(2) (1993). HRS § 707–717(1) (1993) provides: "A person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided in section 707–716." Terroristic threatening in the second degree is a misdemeanor. HRS § 707–717(2) (1993).

**4.** Hawaii Rules of Evidence (HRE) Rule 803(b)(2) (1993) provides: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:.... Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." (Enumeration omitted; format modified.)

testimony continued, over interspersed objections by defense counsel, here omitted:

Q.  Sergeant, thank you.

What did [the CW] tell you happened?

A.  Okay. She stated to me that she and Mr. Machado had been in a relationship for approximately a year and a half. And they have lived together at the residence for four months.

On this evening—

. . . .

Q.  You may continue, Sergeant, please, what did she tell you?

A.  Okay. On this evening on the 27th, 9/27/2001 at approximately 6:00 p.m., she was with some friends at the Asian Sports Bar in Kahului and was waiting for Mr. Machado.  She contacted him via telephone and found that he was somewhere else on Lower Main and that he would— he'll be joining her, I believe, was stated in my report.

She waited for another two hours.  He still doesn't show up, so she left the bar at about 8:00 p.m. Upon arriving home she cooked dinner.  And she then began packing his belongings and threw it outside of the residence.

Approximately 10:00 p.m.—

. . . .

Q.  Sergeant Hirayama, did [the CW] tell you what happened after she threw Mr. Machado's clothes outside?

A.  Yes. Approximately at 10:00 p.m. he arrived home and she had locked him out of the residence.  He then attempted to gain entry by removing a screen on the kitchen window.  Seeing this, she allowed him to enter the residence.  Once within the kitchen area, Mr. Machado grabbed her from behind, holding her in a—what she said was a chokehold with his right arm.

There was a struggle, he held her with her—okay, after he got her in a chokehold, he stated—her words were that he stated that, "Don't fuck with me." There was a struggle.  He grabbed her with his left hand and pulled on her hair, and wrestled her to the ground. While they were strug-gling to the ground, she had bit him on the left—on his left arm.

After they were on the ground, she somehow got out of his hold.  He then stepped on her head.  And he reached for a steak knife within the dish rack there on the counter.  After obtaining the steak knife, he stated that, "Don't fuck with me, I'll kill you."  He then replaced the knife in the dish rack.

Then he started to feel around—what she described—what she said was reaching for another knife, a bigger knife which they kept on the counter.

She then kicked him in the groin area, at which time he released her.  She stood up, attempting to leave the kitchen area.  He grabbed her from behind, spun her around, and grabbed her by the throat.  There was a slight struggle.  She got up.  She got loose from that and contacted the police.

After Sergeant Hirayama finished reciting the CW's oral statement, defense counsel attempted to elaborate the hearsay objection:

[DEFENSE COUNSEL]:  Judge, may I put an objection on the record please at the bench?

THE COURT:  You may approach.

(Bench conference.)

[DEFENSE COUNSEL]:  I think I need to rationalize my previously made objection a little more clearly, I guess, Judge.  There has—what [the DPA] just did, I've never seen before, I mean if you could prove a case like this, every abuse case, which is have a copy of the report, and he see [sic] what happens, that's it.  He's trying to work off his memory, which is not very reliable two years later.  It's just excessive hearsay.  I don't see how this person can enter—an out of court statement made by [the CW] for the truth of the matter asserted, when she has not— normally come in as impeachment evi-dence—I will have no problem with that.  But the fact that [the CW] has not stated anything contrary, nothing inconsistent, this is improper hearsay.

THE COURT:  Counsel—counsel, look at 803(b), and clearly, I think this is an

exception, either as excited utterance or her statement of her then impressions of what then occurred. Clearly it was close enough in time and the situation involved—let me describe, as something that would cause someone to be excited or agitated. We're not talking about somebody sort of walking down the street—describing what they saw as they walk down the street.

[DEFENSE COUNSEL]: But the whole allegation here is a dispute, as far as you know, who did what.

THE COURT: Right.

[DEFENSE COUNSEL]: And ten minutes is ample time for her to make up a story.

THE COURT: Counsel, you can argue that, but I think it's excited utterance when something like this, allegedly violent to occur, having taken a statement ten minutes within it occurring. It falls within the exception.

Sergeant Hirayama then related his observations of the CW and Defendant that night. Sergeant Hirayama saw redness on the CW's right hand and on her neck and chin. He noticed an abrasion on her left knee. Sergeant Hirayama detected foundation makeup between Defendant's right biceps and forearm, the same kind the CW wore on her face and neck area. Sergeant Hirayama also collected a skein of black hair he found on the kitchen table. Sergeant Hirayama recalled that Defendant had a bite mark just above his left wrist and a scratch on his left shoulder.

MPD officer Melvin Johnson (Officer Johnson) testified that he arrived on the scene after Sergeant Hirayama, at about 10:24 p.m. Officer Johnson detected the odor of alcohol on Defendant. He also noticed that Defendant's eyes were red and glassy and that his speech was slurred. Officer Johnson saw that Defendant had scratches on the left side of his face, and on his neck, shoulder and both forearms. After he and Sergeant Hirayama completed their investigation of the incident, Officer Johnson arrested Defendant. As part of his investigation, Officer Johnson recovered a steak knife from the kitchen floor.

Next, the jury heard a tape of the CW's 911 call. She was sobbing and appeared very upset throughout the call, and repeatedly pleaded for help:

Please hurry up he's going to kill me, please hurry.

. . . .

My boyfriend Dennis Machado.

. . . .

He choked me and he, he tried to stab me with a knife, please help me, please help me.

. . . .

He choked me and he, he choked me and he held me on the ground and stepped on my head, he pinned me down and tried to stab me, and he slammed me into the wall, please, please.

The CW was the State's last lay witness. Right off the bat, the CW acknowledged that she did not want to testify, " 'Cause I don't feel safe being here." Her testimony turned out to be consistent in all essentials with the oral statement she had made to Sergeant Hirayama at the scene, except for the following:

Q. Okay. After you were on the ground, where was Mr. Machado?

A. He was above me.

Q. What was doing while he was above you?

A. He was standing above me, and he was holding on to the kitchen table to keep his balance. And he put his foot on my head to hold me down. And then—like, you know, tried to hold me there, and you know, like he was tumbling and trying to get—the counter—where the utensil drawer is.

And he still had his foot on my head. And I was trying to get his foot off of my head so I could get back up. Then he opened the drawer and he was fumbling through the drawer like he was looking for something in the utensil drawer. And because I kept moving from under him—I think was getting up.

Q. Did Mr. Machado grab anything?

. . . .

Q. What did Mr. Machado do in relation to the utensil drawer?

. . . .

A. He had to come back to me, because I was trying to get up.

. . . .

Q. Was Mr. Machado saying anything to you while your head was pinned to the floor?

A. I don't remember if he was saying anything at that time.

. . . .

Q. Why was it that his foot came off your head?

A. Because I was slipping out from under him, and he had to come back to me to try to get me back down.

Q. So what did he do?

A. What did he do? Somehow—went down on the floor, and got—I slid like, pushed across the floor to the refrigerator. I couldn't go any more because the refrigerator was right there. And we ended up by the kitchen sink. And he was on top of me, and I was on my back.

Q. Okay. Can you describe to the ladies and gentlemen of the jury how it was that he was on top of you?

A. When I finally hit the refrigerator, he straddled over me on his knees—and his knees over here.

Q. For the record, you're pointing to your chest area?

A. Yes.

. . . .

Q. [Ms. CW], when Mr. Machado was doing that to you, when he had you on the floor, his knees was [sic] on your chest, was he saying anything to you?

A. He was yelling at me, and I was telling him, "Dennis, stop it, stop."

Q. What was Mr. Machado yelling?

A. He was yelling at me, "Don't F' with me. Don't F' with me."

. . . .

A. And I wasn't doing anything. I told him to "Stop, Dennis, please stop." And he choked me, and I couldn't even scream any more. And I tried to get up.

. . . .

Q. [Ms. CW], what is the next thing you remember after being choked by Mr. Machado?

A. Dennis tried to stand up. And he put his two feet on the sides of my neck, like this, to hold me there.

Q. And you were still on the ground?

A. Yes.

Q. What did Mr. Machado do while he had both his feet on either sides [sic] of your neck? Did he grab anything, [Ms. CW]?

A. Yes, he did.

Q. What did he grab?

. . . .

Q. [Ms. CW], what did he grab?

A. He grabbed this steak knife from the dish rack.

Q. What did he do with the steak knife?

A. He was choking my neck. And he was yelling at me like this and like this and telling me not to F' with him.

Q. Okay. And for the record you had your hand up. Is that how he had the knife in his fist, held to the side of his head?

A. (The witness nods head up and down.)

. . . .

Q. Can you show us, [Ms. CW], can you show us while you're sitting there what he did?

A. He had me—he had my neck and he was like this. And he was yelling at me and then he put it back in the dish rack.

Q. What did he yell to you?

A. He just kept yelling the same thing over and over, "Don't F' with me, don't F' with me, don't F' with me."

Q. Okay. And then what happened?

A. And he put it back. And that's when he stood up and he put his feet—and he was tumbling on the side of the dish rack like he was looking for something else. And then I put my feet up because he was standing above me and I put my feet into his crotch and I lifted him off of me.

Q. Can you describe how that happened to the jury, how you were able to do that?

A. I was just already under him and I just put my feet up and I lifted him off of me. And I turned away, and I got away. And I was—I went to the door and I came back. I came back for my keys.

Q. What happened then?

A. And I went—I went to the doorway, and he was standing facing the stove. And he was just standing there, so I was going around him to get my keys and my phone from the kitchen table, and he came at me again.

Q. When he—

A. I didn't even do anything. He came at me again. He grabbed me by my neck. And he slammed me into the hallway wall. And I told him, "Dennis, please stop it, you're hurting me." And he grabbed my chin again, and he did that thing, he twisted my neck again. And I was crying, I said, "Please stop. You're hurting me. Stop. Stop."

Q. When Mr. Machado was doing that to you in the hallway, what was he saying to you?

A. I don't know, I don't know.

Q. What's the next thing you remember, [Ms. CW]?

A. I ran to the bedroom. I picked up the phone and I called 911.

. . . .

Q. While you were on the phone with 911 did the police arrive?

A. Yes, they did.

. . . .

Q. Did you tell one of the officers that Dennis threatened to kill you?

A. I don't know what I told them.

Q. Okay. Did Dennis say that?

A. What?

Q. That "I'm going to kill you"?

A. I don't think he ever said that to me, I don't think so. I just remember him yelling at me not to F' with him.

. . . .

Q. [Ms. CW], did you think that Mr. Machado was threatening to kill you?

A. I don't know.

. . . .

A. I just remember thinking I couldn't believe this was happening. I felt, you know, like I felt really shocked. I couldn't believe—

. . . .

Q. [Ms. CW], I'm showing what has been marked as State's Exhibit S–1, I'm asking you to look at. Don't read out loud what it says. Just look at it yourself. Let us know when you're done reading it.

[Ms. CW], State's Exhibit S–1 that I just showed you, is that your handwriting?

A. (The witness nods head up and down.) Yes.

Q. Is that the form that you filled out on September 27 2001?

A. Yes.

Q. Did you write out on that form that, "The defendant threatened to kill me with a kitchen knife"?

A. Yes.

On cross-examination, defense counsel asked the CW whether she was on medication the night of the incident:

Q. Okay. Let me ask you this. Back on September 27th 2001, you were on medication, weren't you?

A. No. What kind of medication?

Q. Well, any kind of medications?

A. No.

Q. Well, weren't you on at least birth—

THE COURT: Well, counsel, she already stated-she answered the question she as not on any medication that day.

[DPA]: Judge—

THE COURT: [Mr. Defense Counsel], the witness stated she had not been on any medication. That's her answer. If you're able to impeach that by some evidence that you have, that's fine. She answered the question.

BY [DEFENSE COUNSEL]:

Q. Okay. Fine. But [Ms. CW], you remember testifying at another hearing back in June, right?

A. The first trial?

Q. The prior hearing in this matter—

[DEFENSE COUNSEL]: May we approach, Your Honor?

THE COURT: Yes.

(Bench conference.)

. . . .

THE COURT: I'm going to instruct the jury to disregard her last response.

[DEFENSE COUNSEL]: Your Honor, I'm going to move for a mistrial. [The DPA], before the trial started made a strong request that not one mention of that trial be made. And that has been made by the State's witness, who was not instructed appropriately by the prosecutor's office. I would so move for a mistrial.

THE COURT: At this point, I'm going to deny the motion for a mistrial. That clearly may be some issue on appeal, however.

[DEFENSE COUNSEL]: Thank you.

(Bench conference concluded.)

[THE COURT]: [Ms. CW], you may come back up to the stand.

At this point, I'm going to order that last response of [Ms. CW] stricken for consideration by the jury.

BY [DEFENSE COUNSEL]:

Q. Okay. [Ms. CW], you recall testifying at a prior hearing in this matter back in June of 2002, correct?

A. Yes.

Q. And you remember being under oath at that hearing as well, right?

A. Yes.

Q. And isn't it true that at that hearing, you testified that you were on medications?

A. I don't remember.

Q. Okay. And so you don't remember if you were affected by any side effects of any medication back then?

[DPA]: Judge, I'm going to object. Misstates the testimony; this question has been asked and answered.

THE COURT: Counsel, she apparently testified that she was not under any medication.

By [DEFENSE COUNSEL]:

Q. You would agree with me, though, that back on September 27 2001, you had taken—or you had drank quite a bit of alcohol, right?

A. Right.

Q. And that all started at Asian Cuisine at about 4:15 that afternoon, right?

Q. Yes.

. . . .

Q. So a total of over five hours that you were there?

A. Yes.

Q. I take it you were not an alcoholic back on September 27 2001?

[DPA]: Objection, Judge.

THE COURT: I will sustain the objection.

BY [DEFENSE COUNSEL]:

Q. Well—well, you were—around the September area, 2001, you weren't a drinker were you?

[DPA]: Objection, Judge.

THE COURT: I'll sustain the objection.

Counsel, if you want to ask her questions about how much she had to drink that night, you're certainly free to do that.

[DEFENSE COUNSEL]: Judge, may we approach?

THE COURT: No.

[DEFENSE COUNSEL]: This goes to her credibility, Judge.

THE COURT: Counsel, please continue.

BY [DEFENSE COUNSEL]:

Q. [Ms. CW], is it safe to say that you were affected by the amount of alcohol that you drank that day?

A. What do you mean by "affected"? I was coherent.

The State's last witness was Stacy Moniz (Moniz), qualified by the circuit court as "an expert in the field of domestic violence." Just before she took the stand, the following colloquy occurred:

THE COURT: Counsel, if you could approach the bench, please, for just a moment?

(Bench conference.)

[Mr. DPA], I wanted to get clear whether you believe there was recantation relative to the testimony of the witnesses— relative to the testimony of [Ms. CW], excuse me.

[DPA]: The major one, Judge, is obviously the first trial of June 4th 2002, where [defense counsel] elicited that she did not, in fact, testify about the knife in question. She did explain that.

THE COURT: Right, right.

[DPA]: And this trial we certainly have the statement about the defendant threatening to kill [Ms. CW]; that she did, in fact, tell Officer Hirayama that.

THE COURT: All right.

(The bench conference is concluded.)

Moniz—who was familiar with neither the protagonists nor the police reports in this case—proceeded to testify, generally, about how the dynamics of domestic abuse can induce recantation or minimization by the victim. During her testimony, Moniz rather consistently used the masculine in referring to the perpetrator and the feminine in referring to the victim. Defense counsel hastened to point this out on cross-examination:

Q. Yeah. And the fact of the matter is when you were in direct, you used those words synonymously, "victim" and "women", isn't that right?

A. Yes.

Q. Yeah. So in your mind, if you're a woman, you're a victim, isn't that right?

A. Not necessarily, but in most of the cases, the statistics show ninety-five percent domestic violence is male to female—that's FBI statistics.

. . . .

Q. Okay. Let's get this straight for the jury. You're telling the jury that because the FBI has some kind of statistic that says that ninety-five percent of convicted batterers are males, that you automatically equate victims with females?

A. That's how I refer to it when I'm doing presentations or—I'm not saying—when I do a presentation, I'll say that there are women who are violent—

. . . .

A. Because in so many of the cases, it's male to female violence, I just use that, because that's what we see more often than not, that women are victims of male violence.

. . . .

Q. Well, I mean it's what you see, because your place is called Women Helping Women, right? You don't help men, do you?

A. Sure, we do.

Q. So if a man goes over to Women Helping Women, you would help a man?

A. We help many men.

Q. But you don't refer to any of those men as victims?

A. I didn't say that. I say that overwhelmingly ninety-five percent in a study by the FBI says male to female violence, so for simplicity sake and for—based on the study, she tends to be the victim; he tends to be the batterer. So I just use that—it helps it be more—and that's what we see. But that doesn't mean that we don't work with men, and we don't see men who are victims.

. . . .

Q. And in fact, you got into this whole area because you were in an abusive relationship from the age of fifteen, right?

A. Uh hmm, yes.

Q. Right. And so this whole thing about—well, you'd agree with me that, really, your interest that got you into this field and that has propelled you to where you are, is really one to help others who are similarly situated to what you were?

A. Right.

Q. So in other words, to help women who you think have been victimized?

A. Exactly.

Q. And that's your interest in all of this, right?

A. Yes.

Q. And your interest is not to help men who are accused being batterers, right?

A. Right. That's not my—

Q. I have no further questions. Thank you.

[DPA]: I have nothing, Your Honor, thank you very much.

THE COURT: Thank you.

After the State rested its case, Defendant brought a motion for judgment of acquittal,

which was denied. It was at this point that defense counsel returned to the issue of the CW's use of medication on the day in question:

[DEFENSE COUNSEL]: Thank you, Your Honor.

Can I put just one other thing on the record before we move on?

[THE COURT]: Yes.

[DEFENSE COUNSEL]: Early on in [the CW's] testimony, I asked her questions whether she was on medications back on September 27 2001. She answered "no".

[THE COURT]: Correct.

[DEFENSE COUNSEL]: At which time I tried to establish a foundation to impeach her later with prior testimony. In order to lay that foundation, I needed to read a statement from her prior testimony. And the Court denied me the opportunity to lay that foundation, as well as to approach the Court to make an offer of proof.

The offer of proof that I wanted to make was that had she denied—continued to deny making that statement, I could have brought in extrinsic evidence of the prior hearing via transcript of her testifying that she was on medications back on September 27 2001. And that goes to her state of mind in terms of what happened.

[THE COURT]: What's the medication you're referring to, counsel?

[DEFENSE COUNSEL]: It doesn't matter.

[THE COURT]: Well, yes, it does matter, of course. Because the question is whether it was medication which is likely to affect a person's state of mind.

[DEFENSE COUNSEL]: I think if you read the bottle of almost every medication, it says, "Do not mix with alcohol". We have testimony that she drank excessive alcohol that day.

[THE COURT]: Well, there's testimony that she had two drinks, is what we heard on the record so far. What is the medication?

[DEFENSE COUNSEL]: It doesn't matter, Your Honor, medication—she testified in a prior hearing that she was on medications. That not only in that hearing, she testified that medication caused hair loss as well as mood swings. And her mood on September 27 2001 is directly at issue in this case. And I would just like to put on the record that I was deprived the opportunity to even lay the foundation to bring in extrinsic evidence.

[THE COURT]: What is the medication, counsel, what's your offer of proof?

[DEFENSE COUNSEL]: I don't know what the medication is. All I know is that she has, in a prior hearing under oath, testified that she was on medication that tended to result in mood swings as well as hair loss. And that's germane to this case.

[THE COURT]: Counsel, I think if you're going to create—you want to make some offer of proof, you need to indicate, at least, some indications of what the medication is, so there can be some indication as to whether, in fact, there would be any relationship between the mood she was in at the time and the medication. Otherwise, it's merely impeachment on some peripheral issue.

[DPA]: Judge, if I may, I just disagree with [defense counsel's] account of this trial, whether or not the Court refused to let him get into this theory—and [defense counsel] stopped it himself, and did not attempt to impeach the witness with her prior testimony with the transcript. He at no time—

THE COURT: Well, that is correct, counsel. Well, what happened, [Mr. Defense Counsel], just to refresh your recollection, is you asked her if she was on medication. She said "no". And you made no attempt to, in fact, impeach based on any kind of prior matter.

[DEFENSE COUNSEL]: That's because I was trying to lay the foundation for this—this is just for the record on appeal, because I remember at that particular point, vividly, that the Court refused to allow me to even ask one more question, because she's already said "no".

And in my opinion, the Court was protecting the witness. And I thought that was improper and denied me even the

foundation to bring in very germane evidence.

THE COURT: [Mr. Defense Counsel], are you not prepared at this time to make an offer of proof as to what the medication was at this point?

[DEFENSE COUNSEL]: Your Honor, I don't think that's relevant.

THE COURT: It's a "yes" or "no" question. You already stated you don't think it's relevant. Are you prepared at this time to indicate what the medication was?

[DEFENSE COUNSEL]: No, Your Honor. But when the witness, herself, has testified that that exact medication, whatever it is, results in side effects, according to her own testimony, then it doesn't matter what kind of medication it is, if the issue is what was the result of that medication. I think I made the record perfectly clear.

[THE COURT]: Well, Counsel, is there a reason why you didn't attempt to make the offer of proof at the time the witness was testifying?

[DEFENSE COUNSEL]: Because you refused to let me approach the bench. And I think the record is going to be clear to support that.

[THE COURT]: Did you make any attempt to make offer of proof up to this point in time?

[DEFENSE COUNSEL]: No. Because after a while, you refused to allow me to approach the bench at all. And so it slips my mind, and so that's why I'm putting it on right now.

[THE COURT]: Okay. Well, you had plenty of time to put in an offer of proof before now as to what the issue may have been with regard to prior testimony.

[DEFENSE COUNSEL]: That's the Court's statement, but in its actions, the Court refused to allow me to even approach the bench.

[DPA]: I disagree that that's what happened, Judge.

[THE COURT]: I think the record will speak for itself.

Defendant did not testify and did not present evidence of his own. The jury returned verdicts of guilty of the abuse, as charged, and guilty of the threatening in the lower degree.

## II. Discussion.

### A.

Defendant first contends the circuit court was wrong to admit the CW's oral statement as an excited utterance under Hawaii Rules of Evidence (HRE) Rule 803(b)(2) (1993). *See State v. Moore*, 82 Hawai'i 202, 217, 921 P.2d 122, 137 (1996) ("where the admissibility of evidence is determined by application of the hearsay rule, there can be only one correct result, and the appropriate standard for appellate review is the right/wrong standard" (citation and internal quotation marks omitted)).

■ We disagree with Defendant's first contention. The CW's oral statement described the domestic abuse and was made at the scene in a matter of minutes after the abuse and while the CW was still "pretty hysterical or pretty emotional[.]" Clearly, "(1) a startling event or condition occurred; (2) the statement was made while the declarant was under the stress of excitement caused by the event or condition; and (3) the statement relates to the startling event or condition." *Id.* at 218, 921 P.2d at 138 (citations omitted). *See also State v. Clark*, 83 Hawai'i 289, 297, 926 P.2d 194, 202 (1996). Hence, the foundational requirements were fulfilled and the CW's oral statement was admissible as an excited utterance under HRE Rule 803(b)(2). *Moore*, 82 Hawai'i at 218, 921 P.2d at 138; *Clark*, 83 Hawai'i at 297, 926 P.2d at 202.

Defendant nevertheless argues that the CW's experience was nothing compared to being stabbed in the chest, as the victim was in *Clark*, 83 Hawai'i at 291, 926 P.2d at 196, or being shot five times, as the victim was in *Moore*, 82 Hawai'i at 206, 921 P.2d at 126, such that it cannot be said, here, that "a person under the sway of excitement precipitated by an external startling event will not have the reflective capacity essential for fabrication and that, consequently, any utterance will be spontaneous and trustworthy." *Id.* at 218, 921 P.2d at 138 (citation and

internal quotation marks omitted). *See also Clark*, 83 Hawai'i at 296, 926 P.2d at 201. We disagree. Neither *Moore* nor *Clark*, nor any other authority, requires that the "startling event or condition" of HRE Rule 803(b)(2) be extravagantly violent. The florid domestic abuse in this case certainly qualifies under the rule in this regard.

Defendant also avers that the CW's oral statement was too comprehensive and coherent to qualify as an HRE Rule 803(b)(2) excited utterance, in light of the relatively brief and exclamatory statements of the victims in *Clark*, 83 Hawai'i at 291, 926 P.2d at 196, and *Moore*, 82 Hawai'i at 206, 921 P.2d at 126. Here again, we cannot agree. Common experience—counterintuitive though it may seem to some—counsels otherwise.

■ Finally on this point of error, Defendant concludes, "it is clear that she had at the very least eight minutes, based on Officer Hirayama's testimony. [The CW] is a schoolteacher who is clearly mentally facile and well-spoken. She had plenty of time to either fabricate or embellish a story that would turn her into the victim." Opening Brief at 23. We are not convinced. It has been said that "a statement made within minutes of a startling event can often fairly be characterized as the product of excitement rather than of deliberation." *Moore*, 82 Hawai'i at 221, 921 P.2d at 141. But ultimately, "Lack of capacity to fabricate, rather than lack of time to fabricate is the justification for this rule." *Id.* at 218, 921 P.2d at 138 (brackets, citation and internal quotation marks omitted). *See also Clark*, 83 Hawai'i at 296, 926 P.2d at 201. Several sources in the evidence spoke to the febrile emotional state of the CW at the time, and thus declare to us that the CW's oral statement was indeed an HRE Rule 803(b)(2) excited utterance in this respect, considering where applicable, "the nature of the event, the age of the declarant, the mental and physical condition of the declarant, the influences of intervening occurrences, and the nature and circumstances of the statement itself." *Moore*, 82

Hawai'i at 221, 921 P.2d at 141 (citations omitted). *See also Clark*, 83 Hawai'i at 297, 926 P.2d at 202.

### B.

Defendant next contends the circuit court abused its discretion in allowing Moniz to testify as an expert witness. *See Barcai v. Betwee*, 98 Hawai'i 470, 479, 50 P.3d 946, 955 (2002) ("the decision whether to admit expert testimony rests in the discretion of the trial court" (citation omitted)). This contention has two parts.

First, Defendant points out that it was the CW's excited utterance that caused the contradiction with her trial testimony about whether Defendant threatened to kill her with the knife. This contradiction, Defendant asserts, was the only basis of relevance for Moniz's expert testimony on recantation and minimization, and because the circuit court wrongly admitted the excited utterance in the first place, it *ipso facto* abused its discretion in admitting Moniz's expert testimony. Having rejected Defendant's predicate point, *supra*, we reject this one, as well.

■ Second, Defendant asserts that Moniz's consistent reference to men as batterers and women as victims was more prejudicial than probative,[5] and thus erroneously allowed: "The juror's [ (sic) ] minds were programmed *by an expert* to view the male—the defendant—as the abuser, the batterer, the violent partner capable of wielding a knife and pulling out his girlfriend's hair, of putting her in a choke hold, of stepping on her head." Opening Brief at 26 (emphasis in the original). Defendant's assertion lacks merit. We doubt whether juries are so easily manipulated. Furthermore, defense counsel's cross-examination of Moniz revealed to the jury a statistical explanation for her gender references, as well as an acknowledgment of the lesser probability that women can be batterers and men can be victims. Defense counsel also managed to place before the jury a related implication of purported gen-

---

5. HRE Rule 403 (1993) provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

der bias on the part of Moniz herself. Given the foregoing, we cannot conclude, as to Moniz's expert testimony, that "its probative value [was] substantially outweighed by the danger of unfair prejudice[.]" HRE Rule 403 (1993). At any rate, if error there was, under the foregoing circumstances it was harmless beyond a reasonable doubt. *See State v. Holbron*, 80 Hawai'i 27, 32, 904 P.2d 912, 917 (1995). In this last regard, we note that the jury convicted Defendant of the misdemeanor threatening offense, and not the charged felony offense of threatening with a knife.

## C.

■ For his last point of error on appeal, Defendant complains he was denied his constitutional right to confrontation, when the circuit court prevented defense counsel from impeaching the CW with her prior testimony that she was on a medication the night of the incident which caused mood swings and hair loss. According to Defendant, the circuit court did so by forbidding defense counsel's request to approach the bench to make an adequate offer of proof.

This point rests upon a misinterpretation of the record, and is without merit. As the colloquies quoted above as background clearly show, the circuit court did not prevent defense counsel from approaching the bench in connection with the medication issue. Rather, the circuit court heeled defense counsel while he was questioning the CW about her drinking the night of the incident, and only after he had posed a series of patently objectionable questions on the subject. This being clear, what is obvious from the record is that defense counsel did not proffer the impeachment in a timely manner, and did so only after the State had rested its case—in effect, after the close of all evidence. Nor did defense counsel properly proffer the impeachment at any time, on account of his failure or refusal to specify what the medication was and what material moods resulted.[6]

In any event, on the extant offer of proof and the record before us, the proffered impeachment was properly excluded because, clearly, "its probative value [was] substantially outweighed by the danger of unfair prejudice[.]" HRE Rule 403. Hence, the circuit court did not abuse its discretion in this connection. *See State v. Peseti*, 101 Hawai'i 172, 178, 65 P.3d 119, 125 (2003) ("the scope of cross-examination at trial is within the discretion of the trial court" (brackets, ellipsis, citations and block quote format omitted)). Further, there was ample evidence before the jury, including the admissions of the CW herself, that she had been drinking heavily on the night in question, that she was angry with Defendant, and that she was certainly not passive in her anger. Consequently, if error there was in the exclusion of the proffered impeachment, it was harmless beyond a reasonable doubt. *See Holbron*, 80 Hawai'i at 32, 904 P.2d at 917.

## III. Conclusion.

For the foregoing reasons, we affirm the circuit court's January 12, 2004 judgment, as it was amended on February 12, 2004.

---

6. HRE Rule 103(a)(2) (1993) provides, in pertinent part: "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:.... In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." (Enumeration omitted; format modified.)