127 P.3d 941

STATE of Hawai'i, Respondent/Plaintiff–
Appellee

v.

Dennis MACHADO,
Petitioner/Defendant–Appellant.

No. 26396.

Supreme Court of Hawai'i.

Jan. 24, 2006.

Josette Anne Wallace, on the writ, for petitioner/defendant-appellant.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

Petitioner/Defendant–Appellant Dennis Machado (Petitioner) filed an application for writ of certiorari[1] on November 2, 2005, requesting that this court review the published opinion of the Intermediate Court of Appeals (the ICA),[2] affirming the January 12, 2004 judgment of the circuit court of the second circuit (the court),[3] as amended on February 12, 2004, convicting Petitioner of the included offense of terroristic threatening in the second degree, Hawai'i Revised Statutes (HRS) § 707–716(1)(d) (1993) (Count I), and abuse of a family or household member, HRS § 709–906(1) (Supp.2004) (Count II). *State v. Machado*, 109 Hawai'i 424, at 424– 425, 435, 127 P.3d 84 at 84– 85, 95, 2005 WL 2418055 (2005). We granted certiorari to correct the ICA's determination that the court did not err in admitting the testimony of Sergeant Roy Hirayama (Sergeant Hirayama) recounting the statement made by the complaining witness (CW or the CW) as a hearsay exception under Hawai'i Rules of Evidence (HRE) Rule 803(b)(2), but agree with Respondent/Plaintiff-Appellee State of Hawai'i (the prosecution) that this error was harmless beyond a reasonable doubt. Accordingly, we affirm the decision of the ICA, which affirmed the conviction of Petitioner for the included offense of terroristic threatening in the second degree, HRS § 707– 716(1)(d)[4] (Count I) and abuse of a family or household member, HRS § 709–906(1)[5] (Count II),[6] except insofar as the decision must be modified as indicated herein.

1. Pursuant to HRS § 602–59 (1993 & Supp. 2004), a party may appeal the decision of the Intermediate Court of Appeals (ICA) only by an application to this court for a writ of certiorari. *See* HRS § 602–59(a). In determining whether to accept or reject the application for writ of certiorari, this court reviews the ICA decision for:

(1) grave errors of law or of fact, or (2) obvious inconsistencies in the decision of the intermediate appellate court with that of the supreme court, federal decisions, or its own decision, and the magnitude of such errors or inconsistencies dictating the need for further appeal.

HRS § 602–59(b). The grant or denial of a petition for certiorari is discretionary with this court. *See* HRS § 602–59(a).

2. The opinion was issued by Acting Chief Judge John S.W. Lim, and was joined by Associate Judges Daniel R. Foley and Alexa D.M. Fujise.

3. The Honorable Joel E. August presided.

4. HRS § 707–715 (1993) defines "terroristic threatening" as follows:

A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:
(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person; or

(2) With intent to cause, or in reckless disregard of the risk of causing evacuation of a building, place of assembly, or facility of public transportation.
HRS § 707–716(1)(d) states:
(1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:
    . . . .
(d) With the use of a dangerous instrument.
HRS § 707–717 (1993) states in relevant part that "[a] person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided in section 707–716."

5. HRS § 709–906(1) states:
(1) It shall be unlawful for any person, singly or in concert, to physically abuse a family or household member or to refuse compliance with the lawful order of a police officer under subsection (4). The police, in investigating any complaint of abuse of a family or household member, upon request, may transport the abused person to a hospital or safe shelter.
For the purposes of this section, "family or household member" means spouses or reciprocal beneficiaries, former spouses or reciprocal beneficiaries, persons who have a child in common, parents, children, persons related by consanguinity, and persons jointly residing or formerly residing in the same dwelling unit.

6. Petitioner was originally charged as follows:
*Count One:* That on or about the 27th day of September, 2001, in the County of Maui, State

## I.

■ In his application Petitioner raises the following question:

When a complaining witness makes a statement that is:

a) coherent and narrative;

b) elicited by police questioning;

c) after an alleged incident of domestic violence;

is such a statement admissible in court through the testimony of the questioning police officer under the excited utterance exception to hearsay?

The following facts and procedural history taken from the ICA's opinion are relevant.

*[A] neighbor ... testified that on September 27, 2001, at about 10:20 p.m., she heard a ruckus at [Petitioner's] house.* "There were screaming, yelling noise, sound like things were breaking.... I heard a woman screaming.... It just sounded like someone was in a serious situation. It sounded very, very loud, like she was hurt, needed help, she was calling out for help." *[The neighbor] called 911. The police arrived within three to five minutes.*

Maui Police Department (MPD) Sergeant Roy Hirayama (Sergeant Hirayama) testified next. *At about 10:22 p.m. that evening, he was dispatched to a reported abuse at [Petitioner's] house. ... At about 10:30 p.m., Sergeant Hirayama heard the [CW] crying inside the house, so he entered and inquired after her.* Sergeant Hirayama recalled, "There was a slight odor of liquor on her breath." He acknowledged that "she was pretty hysterical or pretty emotional."

of Hawai'i, [Petitioner], with intent to terrorize, or in reckless disregard of the risk of terrorizing [CW], did threaten, by word or conduct, to cause bodily injury to [CW] with the use of a dangerous instrument, to wit, a kitchen steak knife, thereby committing the offense of Terroristic Threatening in the First Degree in violation of Section 707–716(1)(d) of the [HRS].

When the deputy prosecuting attorney (DPA) started to question Sergeant Hirayama about what the CW then told him, defense counsel objected to the hearsay, but the [court] admitted it after the DPA cited the excited utterance exception to the hearsay rule.... Sergeant Hirayama's testimony continued, over interspersed objections by defense counsel ...:

Q. Sergeant, thank you.

What did the CW tell you happened?

A. Okay. She stated to me that she and [Petitioner] had been in a relationship for approximately a year and a half. And they have lived together at the residence for four months.

. . . .

Okay. On this evening on the 27th, 9/27/2001 at approximately 6:00 p.m., she was with some friends at the Asian Sports Bar in Kahului and was waiting for [Petitioner]. She contacted him via telephone and found that he was somewhere else on Lower Main and that he would—he'll be joining her, I believe, was stated in my report.

She waited for another two hours. He still doesn't show up, so she left the bar at about 8:00 p.m. Upon arriving home she cooked dinner. And she then began packing his belongings and threw it outside of the residence.

Approximately 10:00 p.m.—

. . . .

... Approximately at 10:00 p.m. he arrived home and she had locked him out of the residence. He then attempted to gain entry by removing a screen on the kitchen window. Seeing this, she allowed him to enter the residence. Once within the kitchen area, [Petitioner] grabbed her from behind, holding her in a—what she said was a chokehold with his right arm.

*Count Two:* That on or about the 27th day of September, 2001, in the County of Maui, State of Hawai'i, [Petitioner] did intentionally, knowingly or recklessly engage in and cause physical abuse of a family or household member, to wit, [CW], thereby committing the offense of Abuse of Family or Household Member in violation of Section 709–906 of the [HRS].

There was a struggle, he held her with her—okay, after he got her in a chokehold, he stated—her words were that he stated that, "Don't fuck with me." There was a struggle. He grabbed her with his left hand and pulled on her hair, and wrestled her to the ground. While they were struggling to the ground, she had bit him on the left—on his left arm.

After they were on the ground, she somehow got out of his hold. He then stepped on her head. And he reached for a steak knife within the dish rack there on the counter. After obtaining the steak knife, he stated that, "Don't fuck with me, I'll kill you." He then replaced the knife in the dish rack.

. . . .

She then kicked him in the groin area, at which time he released her. She stood up, attempting to leave the kitchen area. He grabbed her from behind, spun her around, and grabbed her by the throat. There was a slight struggle. She got up. She got loose from that and contacted the police.

109 Hawai'i at 425–426, 127 P.3d at 85–86 (emphases added) (brackets and footnote omitted). At trial the prosecution offered this testimony under HRE Rule 803(b)(2), the excited utterance exception to the hearsay rule. *See infra* for text. The defense objected to Sergeant Hirayama's testimony as not falling within the exception.

[D]efense counsel . . . elaborat[ed on] the hearsay objection:

[DEFENSE COUNSEL]: . . . *I mean if you could prove a case like this, every abuse case, which is have a copy of the report, and he seek [sic] what happens, that's it.* He's trying to work off his memory, which is not very reliable two years later. It's just excessive hearsay. *I don't see how this person can enter—an out of court statement made by the CW for the truth of the matter asserted, when she has not—normally come in as impeachment evidence*—I will have no problem with that.

But the fact that the CW has not stated anything contrary, nothing inconsistent, this is improper hearsay.

THE COURT: Counsel—counsel, look at 803(b), and clearly, I think this is an exception, either as excited utterance or her statement of her then impressions of what then occurred. Clearly it was close enough in time and the situation involved—let me describe, as something that would cause someone to be excited or agitated. We're not talking about somebody sort of walking down the street—describing what they saw as they walk down the street.

. . . .

[DEFENSE COUNSEL]: *And ten minutes is ample time for her to make up a story.*

THE COURT: Counsel, you can argue that, *but I think it's excited utterance when something like this, allegedly violent to occur, having taken a statement ten minutes within it occurring. It falls within the exception.*

109 Hawai'i at 426–427, 127 P.3d at 86–87 (emphases added) (brackets omitted). The jury also heard the 911 call placed by the CW.[7] As listed by the prosecution, the 911 call included the following statements made by the CW:

1. "Please hurry up he's going to kill me, please hurry"

2. "My boyfriend Dennis Machado"

3. "He choked me and he, he tried to stab me with a knife, please help me, please help me"

4. "He choked me and he, he choked and he held me on the ground and stepped on my head, he pinned me down and tried to stab me, and he slammed me into the wall, please, please"

5. "Somebody's here, the police are here"

II. .

In response to Petitioner's appeal point objecting to the excited utterance exception,

7. Petitioner stipulated to the admission of this tape. Petitioner does not dispute the statements reproduced above.

the ICA initially responded that the startling event need not be "extravagantly violent" and "[c]ommon experience ... counsel[ed]" that the excited utterance need not be "brief and exclamatory."

The CW's oral statement described the domestic abuse and was made at the scene in a matter of minutes after the abuse and while the CW was still "pretty hysterical or pretty emotional[.]" Clearly, "(1) a startling event or condition occurred; (2) the statement was made while the declarant was under the stress of excitement caused by the event or condition; and (3) the statement relates to the startling event or condition." [*State v. Moore,* 82 Hawai'i 202,] 218, 921 P.2d [122,] 138 [ (1996) ] (citations omitted). Hence, the foundational requirements were fulfilled and the CW's oral statement was admissible as an excited utterance under HRE Rule 803(b)(2).

[Petitioner] nevertheless argues ... that it cannot be said, here, that "a person under the sway of excitement precipitated by an external startling event will not have the reflective capacity essential for fabrication and, that, consequently, any utterance will be spontaneous and trustworthy." [*Id.*] (citation and internal quotation marks omitted). *We disagree. ... [No] authority[ ] requires that the "startling event or condition" of HRE Rule 803(b)(2) be extravagantly violent. ...*

[*Petitioner] also avers that the CW's oral statement was too comprehensive and coherent to qualify as an HRE Rule 803(b)(2) excited utterance,* in light of the relatively brief and exclamatory statements of the victims in *[State v.] Clark,* 83 Hawai'i 289,] 291, 926 P.2d [194,] 196 [ (1996) ], and *Moore,* 82 Hawai'i at 206, 921 P.2d at 126. Here again, we cannot agree. *Common experience—counterintuitive though it may seem to some—counsels otherwise.*

109 Hawai'i at 433–434, 127 P.3d at 93–94 (emphases added) (citations omitted).

To Petitioner's contention that the witness had time to "fabricate or embellish [her] story," the ICA referred to "[s]everal sources

in the evidence" that ultimately "declar[ed] to [it] that the ... oral statement was indeed" within the exception. However, the ICA did not identify the "several sources" or apply the list of factors said to have been "considered."

Finally ..., [Petitioner] concludes, "it is clear that she had at the very least eight minutes, based on Officer Hirayama's testimony. [The CW] is a schoolteacher who is clearly mentally facile and well-spoken. She had plenty of time to either fabricate or embellish a story that would turn her into the victim." We are not convinced.... *Several sources in the evidence spoke to the febrile emotional state of the CW at the time, and thus declare to us that the CW's oral statement was indeed an HRE Rule 803(b)(2) excited utterance* ..., considering where applicable, *"the nature of the event, the age of the declarant, the mental and physical condition of the declarant, the influences of intervening occurrences, and the nature and circumstances of the statement itself."* Moore, 82 Hawai'i at 221, 921 P.2d at 141 (citations omitted).

109 Hawai'i at 434, 127 P.3d at 94 (emphases added) (citations omitted).

In his application, Petitioner argues in opposition that:

However, *an excited utterance ... is something that should by its essence be a spontaneous event. The excited utterance should not be a statement that is elicited by questioning, especially by a police officer.* ... [T]he key to the spontaneous or excited utterance exception to hearsay is that, "a person under the sway of excitement precipitated by an external startling event will not have the reflective capacity essential for fabrication and that, consequently, any utterance will be *spontaneous* and trustworthy." [*Moore,* 82 Hawai'i at 218, 921 P.2d at 138] (citation and internal quotation marks omitted).

(Emphases added.)

## III.

On appeal, Petitioner argued that (1) "the court improperly allowed extensive hearsay

testimony under the excited utterance exception, which in turn justified improper expert testimony."[8] In conjunction with this point, Petitioner contended that (a) excited utterances are generally made "to someone present at the event," (b) although the complaining witness may have "gone through a startling event," her injuries were "very slight" and insufficient to form the basis of an excited utterance, and (c) prior to making the statement the CW "had plenty of time to either fabricate or embellish a story that would turn her into the victim."

In response, the prosecution maintained that (1) "the trial court was right when it admitted the testimony of Sergeant Hirayama under the excited utterance exception to the hearsay rule, and furthermore, any error in the admission of said testimony was nevertheless harmless beyond a reasonable doubt."

Petitioner did not submit a reply brief. He requested that the appellate court overturn his conviction and remand for a new trial.

## IV.

■ Where admissibility of evidence is determined by application of the hearsay rule, there can only be one correct result and the appropriate standard for appellate review is the right/wrong standard. *Kealoha v. County of Hawai'i*, 74 Haw. 308, 319, 844 P.2d 670, 675, *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993). HRE Rule 802 entitled the "hearsay rule," states that "[h]earsay is not admissible except as provided by these rules, or by other rules prescribed by the Hawai'i supreme court, or by statute." HRE Rule 803(b)(2) (1993) provides as follows:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(b) Other exceptions:

. . . .

(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

The CW testified at trial. Her description of the events on September 27, 2001, was largely consistent with the oral statement Sergeant Hirayama recounted CW made at the scene, except that at trial she testified that she did not remember the Petitioner saying, "I'm going to kill you," while wielding the steak knife.[9] This testimony was as follows:

[DPA]: Okay. You spoke to a cop that came to the scene?

[CW]: There were a few of them that came to the house.

Q: Okay. And did you tell one of the officers about what happened?

A: Yes.

Q: *Did you tell one of the officers that [Petitioner] threatened to kill you?*

A: *I don't know what I told them.*

Q: *Okay. Did [Petitioner] say that?*

A: *What?*

Q: *That "I'm going to kill you"?*

A: *I don't think he ever said that to me, I don't think so. I just remember him yelling at me not to F' with him.*

. . . .

Q: [CW], you, in fact, did fill out this form called "victim volunteer statement"?

A: I filled something out.

Q: And you filled this form out on September 27, 2001?

A: I filled it out in the night—that night.

. . . .

8. Petitioner also raised two additional points on appeal: (1) "the highly prejudicial testimony of an expert in domestic violence was improperly allowed," and (2) "[Petitioner] was deprived of his constitutional right to confront a witness against him when cross-examination directly related to the witness's credibility was not allowed by the court." On certiorari, Petitioner does not argue the ICA committed error regarding either of the additional appeal points. Accordingly, we do not reach these points.

9. This conclusion is based on a comparison of the testimony of Sergeant Hirayama and the CW.

Q: *Did you write on that form that, "The [Petitioner] threatened to kill me with a kitchen knife"?*

A: *Yes.*

(Emphases added.) The written statement the CW completed on September 27, 2001 was not received in evidence. (State's Exhibit 1). Petitioner did not testify at trial.

## V.

As indicated *supra*, to meet the foundational requirements imposed by HRE Rule 803(b)(2), the proponent of the statement must establish that: (1) a startling event or condition occurred; (2) the statement was made while the declarant was under the stress of excitement caused by the event or condition; and (3) the statement relates to the startling event or condition.

In this case, the facts clearly establish that a startling event occurred and that the CW's statement to Sergeant Hirayama related to this event. The parties do not dispute that a neighbor called 911 after hearing screaming, things breaking, and what sounded like someone calling for help and that the CW gave a statement relating to the alleged abusive incident. Our focus, therefore, is on whether the statement was made while the CW was still under the stress of excitement caused by the dispute with Petitioner.

The ultimate question in these cases is "whether the statement was the result of reflective thought or whether it was rather a spontaneous reaction to the exciting event." *Moore*, 82 Hawai'i at 221, 921 P.2d at 141 (internal citation omitted.) This court has said that "[t]he crucial element that buttresses the reliability of [excited utterances] ... is their spontaneity." *In re John Doe*, 70 Haw. 32, 38, 761 P.2d 299, 303 (1988). Regarding the time span between the "startling event" and the statement to be admitted as an excited utterance, this court has stated that "a 'very short' time interval between a startling event and an excited utterance, although a factor in the determination, is not a foundational prerequisite to the admissibility of the statement under HRE Rule 803(b)(2)." *Moore*, 82 Hawai'i at 221, 921 P.2d at 141.

Other factors that courts often look to in determining whether a statement was the product of excitement include, as the ICA related, the nature of the event, the age of the declarant, the mental and physical condition of the declarant, the influences of intervening occurrences, and the nature and circumstances of the statement itself. *Id.* (citations omitted). As noted above, the ICA's opinion cited these factors, but did not expressly apply them in reaching the conclusion that the CW's oral statement was admissible as an excited utterance. Slip op. at 20–21.

## VI.

In this case, we believe the nature and circumstances of the statement are pivotal. The facts adduced at trial established that there was a heated altercation between the CW and the Petitioner, during which the CW was screaming loud enough to prompt a neighbor to call 911. The CW's emotional state was described by Sergeant Hirayama as "pretty hysterical or pretty emotional." The time between the altercation and the CW's statements to Sergeant Hirayama was short and the CW remained visibly upset as she described what had transpired.

Certainly this is a type of situation which could prompt an "excited utterance." In that sense, we agree with the ICA that HRE Rule 803(b)(2) does not require that the precipitating "startling event" be "extravagantly violent." Therefore, we reject Petitioner's argument that the CW's injuries were not severe enough to constitute a "startling event." However, we do not agree that it was an appropriate exercise of discretion for the court to have allowed Sergeant Hirayama to recount the CW's entire statement under the excited utterance hearsay exception.

Other courts have held that lengthy, narrative statements are not admissible as excited utterances. For example, in *West Valley City v. Hutto*, 5 P.3d 1, 4 (Utah Ct.App.2000), the Utah Court of Appeals distinguished between an *excited utterance* and the ongoing discourse of an *excited individual*, holding that it was error to allow a police officer to recount her entire 30 to 45 minute interview with the alleged domestic abuse victim, rath-

er than limiting admission of the officer's testimony to particularized utterances of the victim. In reaching this conclusion, that court noted that the excited utterance exception is limited to "truly spontaneous outbursts." *Id.* at 4. In another domestic dispute case, *State v. Hansen*, 133 Idaho 323, 986 P.2d 346, 349 (Idaho Ct.App.1999), the Idaho Court of Appeals found that the trial court had erred in admitting a victim's statements to a police officer which "were not an exclamation or burst of words in sudden reaction to a startling occurrence[,] but a lengthy recitation of the circumstances surrounding the fight [with her boyfriend] and a request to press charges." We concur with the reasoning of these courts.

In the instant case, Sergeant Hirayama related in his testimony a narrative of considerable length and detail related to him by the CW. The CW discussed the length of her relationship with the Petitioner, the period they had lived together, their plans to meet at the Asian Sports Bar that evening, his failure to arrive, her preparation of dinner, her removal of his possessions from the apartment, and a detailed account of the physical struggle that ensued. Based on the particularized and comprehensive nature of the CW's statement, we conclude that the statement, made in response to questioning by the police, exceeded a "truly spontaneous outburst." *Hutto*, 5 P.3d at 4. Rather, it was a specific and inclusive rendition of the circumstances leading up to the incident and of the incident itself.

*Moore* is distinguishable from the instant case because of the nature and circumstances of the statement made. In *Moore*, a husband was convicted of attempted second-degree murder for shooting his wife. *Moore*, 82 Hawai'i at 209, 921 P.2d at 129. The husband pulled up behind a police car with his injured wife as a passenger. *Id.* at 206, 921 P.2d at 127. While waiting for an ambulance with a police officer, the wife stated that "he shot me," "he's a good man[,] I told him I was leaving him," "he's distraught," and "keep him away from me ... get him away from me," referring to her husband. *Id.* at 217, 921 P.2d at 137. It was held that these statements were admissible under the hear-

say exception for excited utterances. *Id.* at 222, 921 P.2d at 142.

In *Moore*, the wife's statements were several brief and disjointed remarks. At the time, the husband was close enough to overhear her speaking to the officer and question what she was saying. *Id.* at 206, 921 P.2d at 126. The wife had been shot five times and had sustained life threatening injuries. *Id.* The police officer, to whom the wife made her statements, testified that she was perspiring and that her voice was "barely audible." *Id.* Also, likely due to her physical and mental condition at the time, her statement lacked coherence. At the time the statements were made, the wife was suffering from a collapsed lung and had lost approximately one-half of her blood. *Id.* at 222, 921 P.2d at 142.

This case, on the other hand, involved a lengthy narrative of the events of an entire evening. As related by Sergeant Hirayama, the CW's statement was detailed, logical, and coherent. The statement was not delivered under similar life threatening physical conditions that justified the conclusion that the wife in *Moore* was still "under the stress of excitement". HRE Rule 803(b)(2). Based on the nature and circumstances of the CW's statement, we conclude the court erred in admitting the CW's statement under the excited utterance exception to the hearsay rule.

## VII.

The ICA did not determine whether, if the court erred in admitting the CW's statement, such error was harmless beyond a reasonable doubt. Regarding the erroneous admission of evidence by a trial court, this court has said that:

Even if the trial court erred in admitting evidence, a defendant's conviction will not be overturned if the error was harmless beyond a reasonable doubt:

[T]he error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, *the real question becomes whether there is a rea-*

*sonable possibility that error might have contributed to conviction.*

*State v. Heard,* 64 Haw. 193, 194, 638 P.2d 307, 308 (1981).

*State v. Haili,* 103 Hawai'i 89, 100, 79 P.3d 1263, 1274 (2003) (emphasis added). On appeal the prosecution asserted that the majority of the CW's statement was admitted through other evidence properly admitted at trial, namely the tape recording of the CW's 911 emergency call and her testimony. We believe that the prosecution is correct.

### A.

We address Count II first. The prosecution was required to prove, as to abuse of family or household member, that the defendant (1) intentionally, knowingly, or recklessly, (2) physically abused, *i.e.,* maltreated or injured, hurt or damaged, (3) a family or household member. *See State v. Eastman,* 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996); *State v. Canady,* 80 Hawai'i 469, 476, 911 P.2d 104, 111 (1996); *and State v. Ornellas,* 79 Hawai'i 418, 422, 903 P.2d 723, 727 (1995). The testimony of the CW combined with her 911 call, provided an ample basis to support Petitioner's conviction of the charged offense. The CW testified that she and Petitioner were "boyfriend and girlfriend, living together" and that he had proposed marriage to her. She then described the physical altercation that had taken place:

[DPA]: So what happens?

[CW]: I got upset again. And I was facing him, and he got upset. He didn't leave me alone. And the next thing I know, we started wrestling.

. . . .

Q: How did you start wrestling? Who grabbed who?

A: I remember being in a headlock, he had me in a headlock.

. . . .

Q: When you were standing up, can you describe the headlock.

A: He had me under his arm and in a headlock.

Q: Okay.

A: And he grabbed my neck, and he was turning my head like this. And I could hear my neck cracking and all I could think about is I have to stay on my feet.

. . . .

Q: Why were you thinking you have to stay on your feet, [CW]?

A: Because I knew if he got me on the ground, I wouldn't be able to get back up, because he's heavier than me.

Q: So what happens?

A: So I struggled to stay on my feet. And I tried to grab his hair to pull him away from me. And so he had just cut his hair, so there was nothing to grab. And he kept twisting my neck. And I had to turn in that direction, so it would stop cracking. And that's when I ended up on the ground, because I lost my balance.

Q: Okay. How did it feel when [Petitioner] was twisting your neck?

A: It hurt.

. . . .

Q: How tight was his grip on the headlock?

A: He had my chin like this, and—he was cracking my neck. And it was enough so that I had to jerk my body around to go with the twist, so I would break out of it, but I couldn't get out. He's heavier than me. He had his body weight on top of me, and he had me in the headlock.

. . . .

Q: And you described at some point you lost your balance?

A: Yes.

Q: After you lost your balance, what happened?

A: I was—that was by the table. And I remember him putting his foot on the side of my head.

. . . .

[Prosecutor]: Okay. After you were on the ground, where was [Petitioner]?

[CW]: He was above me.

Q: What was [he] doing while he was above you?

A: He was standing above me, and he was holding on to the kitchen table to keep his balance. And he put his foot on my

head to hold me down. And then—like, you know, tried to hold me there, and you know, like he was tumbling and trying to get—the counter—where the utensil drawer is.

And he still had his foot on my head. And I was trying to get his foot off of my head so I could get back up. Then he opened the drawer and he was fumbling through the drawer like he was looking for something in the utensil drawer. And because I kept moving from under him—I think I was getting up.

. . . .

Q: [CW], when [Petitioner] was doing that to you, when he had you on the floor, his knees was on your chest, was he saying anything to you?

A: He was yelling at me, and I was telling him, "Dennis, stop it, stop."

. . . .

A: And I wasn't doing anything. I told him to "Stop, Dennis, please stop." And he choked me, and I couldn't even scream any more. And I tried to get up.

. . . .

Q: [CW], what is the next thing you remember after being choked by [Petitioner]?

A: [Petitioner] tried to stand up. And he put his two feet on the sides of my neck, like this, to hold me there.

. . . .

Q: What did [Petitioner] do while he had both his feet on either sides of your neck? Did he grab anything, [CW]?

A: Yes, he did.

. . . .

Q: [CW], what did he grab?

A: He grabbed the steak knife from the dish rack.

Q: What did he do with the steak knife?

A: He was choking my neck. And he was yelling at me like this and like this, and telling me not to F' with him.

Q: Okay. And for the record you had your hand up. Is that how he had the knife in his fist, held to the side of his head?

A: (The witness nods head up and down).

. . . .

Q: Can you show us, [CW], can you show us while you're sitting there what he did?

A: He had me—he had my neck and he was like this. And he was yelling at me and then he put it back in the dish rack.

Q: What did he yell to you?

A: He just kept yelling the same thing over and over, "Don't F' with me, don't F' with me, don't F' with me."

Q: Okay. And then what happened?

A: And he put it back. And that's when he stood up and he put his feet—and he was tumbling on the side of the dish rack like he was looking for something else. And then I put my feet up because he was standing above me and I put my feet into his crotch and I lifted him off of me.

. . . .

Q: And what happened then?

A: And I went—I went to the doorway, and he was standing facing the stove. And he was just standing there, so I was going around him to get my keys and my phone from the kitchen table, and he came at me again.

Q: When he—

A: I didn't even do anything. He came at me again. He grabbed me by my neck. And he slammed me into the hallway wall. And I told him, "Dennis, please stop it, you're hurting me." And he grabbed my chin again, and he did that thing, he twisted my neck again. And I was crying, I said, "Please stop. You're hurting me. Stop. Stop."

Based on the CW's testimony and the 911 call, there was proof beyond a reasonable doubt of the elements of abuse of a household member. The CW's testimony established that she was a "family or household member" as she and Petitioner were living together. *See State v. Deleon*, 72 Haw. 241, 242, 813 P.2d 1382, 1382 (1991) (" '[F]amily or household member' means spouses or former spouses, parents, children, and persons

jointly residing or formerly residing in the same dwelling unit."). The unrebutted evidence was that Petitioner had physically abused the CW, *see State v. Nomura,* 79 Hawai'i 413, 416, 903 P.2d 718, 721 (App. 1995) (" 'Physical abuse' means to 'maltreat and connotes such treatment as will injure, hurt or damage a person.'" (Quoting *State v. Kameenui,* 69 Haw. 620, 623, 753 P.2d 1250, 1252 (1988))), and that he had done so with at least a reckless state of mind. As noted above, the CW described Petitioner as holding her in a "headlock," twisting her neck, putting his foot on her head, choking her, and slamming her into a wall. She also specifically testified that "it hurt" when Petitioner twisted her neck.

Her testimony was corroborated by the contents of the 911 call. The jury heard the CW's 911 tape in which the CW stated that Petitioner had choked her, "stepped on [her] head," "pinned" her down, tried to stab her, and "slammed" her into a wall. Petitioner does not dispute the contents of the 911 call.

Hence, disregarding the improperly admitted statement, the CW's testimony and the 911 tape, in and of themselves, established the offense of abuse of family or household member. In light of the entire record, we conclude there is no "reasonable possibility that error might have contributed to [Petitioner's] conviction," *Haili,* 103 Hawai'i at 100, 79 P.3d at 1274, of abuse of family or household member.

### B.

To reiterate, with respect to Count I, the included offense conviction, HRS § 707–715 provides that "[a] person commits the offense of terroristic threatening if the person threatens, *by word or conduct,* to cause bodily injury to another person." (Emphasis added.) *See supra* note 4. As stated previously, the CW's testimony at trial initially differed from the statement that she had given to Sergeant Hirayama in that she testified that she did not think Petitioner had ever threatened to kill her. Apparently, the CW's written statement, although identified, was not employed as substantive evidence pursuant to HRE Rule 802.1(1) (1993) by the prosecution.[10] *See Eastman,* 81 Hawai'i at 136, 913 P.2d at 62 (stating that "an exception to the rule against hearsay can be found in HRE Rule 802.1(1), which provides for substantive use of most prior inconsistent witness statements") (internal quotation marks and citation omitted); *Canady,* 80 Hawai'i at 480–81, 911 P.2d at 115–16 (recognizing that HRE 802.1 adopted and expanded the federal exception to the hearsay rule allowing prior inconsistent statements to be used as substantive proof of the matters asserted in the statement); and *State v. Tomas,* 84 Hawai'i 253, 254, 933 P.2d 90, 91 (App.1997) (holding that "a prior inconsistent statement is admissible as substantive evidence of the facts asserted therein"), *overruled in part on other grounds by State v. Gonsales,* 91 Hawai'i 446, 984 P.2d 1272 (App.1999). However, the CW did confirm that she did write the statement that Petitioner had threatened to kill her with a kitchen knife.

HRS § 707–715 includes threats made by word or conduct. In her testimony, the CW described the Petitioner yelling, choking her, and holding a kitchen knife in a threatening manner. Further, in her 911 call, the CW

---

**10.** HRE Rule 802.1, entitled "Hearsay exception; prior statements by witnesses," states in relevant part:

The following statements previously made by witnesses who testify at the trial or hearing are not excluded by the hearsay rule:

(1) Inconsistent statement. The declarant is subject to cross-examination concerning the subject matter of the declarant's statement, the statement is inconsistent with the declarant's testimony, the statement is offered in compliance with rule 613(b), and the statement was:

(A) Given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition; or

(B) Reduced to writing and signed or otherwise adopted or approved by the declarant; or

(C) Recorded in substantially verbatim fashion by stenographic, mechanical, electrical, or other means contemporaneously with the making of the statement.

HRE Rule 613(b) (1993) states as follows:

(b) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless, on direct or cross-examination, (1) the circumstances of the statement have been brought to the attention of the witness, and (2) the witness has been asked whether the witness made the statement.

stated that Petitioner had tried to stab her with a knife. This was more than sufficient evidence, excluding the improper account of her statement by Sergeant Hirayama, for the jury to find beyond a reasonable doubt that Petitioner had threatened by his conduct to cause bodily injury to the CW. Thus, there was no "reasonable possibility that error might have contributed to [Petitioner's] conviction" of terroristic threatening in the second degree. *Haili*, 103 Hawai'i at 100, 79 P.3d at 1274 (quoting *Heard*, 64 Haw. at 194, 638 P.2d at 308). For the foregoing reasons, we also conclude this error to be harmless beyond a reasonable doubt.

## VIII.

Accordingly, except for the conclusion that the hearsay statement of the CW was prop-

erly admitted as an exception to the hearsay rule, we affirm the October 3, 2005 decision of the ICA, which affirmed the court's January 12, 2004 judgment, as amended on February 12, 2004, convicting Petitioner of the included offense of terroristic threatening in the second degree, HRS § 707–716(1)(d) (Count I), and abuse of a family or household member, HRS § 709–906(1) (Count II).